10-4168-cv
Rosenthal v. NYU

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

## SUMMARY ORDER

**Rulings by summary order do not have precedential effect. Citation to a summary order filed on or after January 1, 2007, is permitted and is governed by Federal Rule of Appellate Procedure 32.1 and this court's Local Rule 32.1.1. When citing a summary order in a document filed with this court, a party must cite either the Federal Appendix or an electronic database (with the notation "summary order"). A party citing a summary order must serve a copy of it on any party not represented by counsel.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, in the City of New York, on the 16th day of May, two thousand twelve.

PRESENT:

> PETER W. HALL,
> GERARD E. LYNCH,
> DENNY CHIN,
> > *Circuit Judges.*

_____

Ayal Rosenthal,

> *Plaintiff-Appellant*,

> -v.-                                                          No. 10-4168-cv

New York University, New York University Leonard N. Stern
School of Business, and Thomas F. Cooley,[*]

> *Defendants-Appellee*s,

> - and -

_____

[*] The official caption of this appeal incorrectly identifies Melchior Ochoa, Chairman of the Stern School of Business Judiciary Committee, as a defendant-appellee. Ochoa was dropped as a defendant in the Second Amended Complaint. The Clerk of the Court is requested to remove Ochoa's name and position from the official caption.

Richard R. West, Dean of the Leonard N. Stern School
of Business, Does 1-10,

　　　　*Defendants.*

_____

For Defendants-Appellees:　　　　　　　　NANCY KILSON, Associate General Counsel,
　　　　　　　　　　　　　　　　　　　　　(Bonnie Brier, General Counsel, *on the
　　　　　　　　　　　　　　　　　　　　　brief*), New York University,
　　　　　　　　　　　　　　　　　　　　　New York, New York.


For Plaintiff-Appellant:　　　　　　　　　EDWARD HERNSTADT, Hernstadt Atlas
　　　　　　　　　　　　　　　　　　　　　LLP, New York, New York.


　　　　Appeal from a judgment of the United States District Court for the Southern District of

New York (Lewis A. Kaplan, *J.*).  UPON DUE CONSIDERATION, IT IS HEREBY

ORDERED, ADJUDGED, AND DECREED that the judgment of the district court is

AFFIRMED.

　　　　Plaintiff-appellant Ayal Rosenthal was convicted of violating federal securities laws

when he provided material, nonpublic information – gained in his capacity as a certified public

accountant – to his brother, an active securities trader.  At the time he committed the crime,

Rosenthal was a candidate for the Master of Business Administration ("MBA") degree at

defendant-appellant Stern School of Business ("Stern"), a subdivision of defendant-appellant

New York University ("NYU").  Before Rosenthal had graduated, a Stern faculty member

learned about Rosenthal's crime, which Rosenthal had not disclosed to any member of the

faculty.  Stern pursued thereafter a disciplinary proceeding that resulted in its decision to refuse

to certify Rosenthal as qualified for the MBA.  Rosenthal sued, asserting various contractual and

2

Article 78 claims, seeking to require NYU and Stern to award him the degree. On September 20, 2010, the district court entered judgment, following a bench trial, declaring that NYU was under no legal obligation to award Rosenthal an MBA and dismissing Rosenthal's various claims for relief. Rosenthal v. NYU, No. 08-Civ. 5338, 2010 WL 3564975 (S.D.N.Y. Sept. 13, 2010). We assume the parties' familiarity with the underlying facts and procedural history in this case.

On appeal, Rosenthal argues that NYU breached its implied contract with its students by failing to observe its own rules and procedures. We review the district court's findings of fact for clear error, and its conclusions of law de novo. United States v. Brennan, 650 F.3d 65, 92 (2d Cir. 2011). As federal jurisdiction over the matter is based on the diversity of the parties' citizenship, New York law applies. For the following reasons, we conclude that Rosenthal's arguments are without merit, and we affirm the judgment of the district court.

While "there is an implied contract between the student and the university that, if he complies with the terms prescribed by the university, he will obtain the degree which he sought," Matter of Carr v. St. John's Univ., 17 A.D.2d 632, 633, 231 N.Y.S.2d 410 (2d Dep't 1962), aff'd, 12 N.Y.2d 802 (1962), courts reviewing such contracts must tread carefully: In order for society to have "complete confidence in the credentials dispensed by academic institutions . . . it is essential that the decisions surrounding the issuance of these credentials be left to the sound judgment of the professional educators who monitor the progress of their students on a regular basis," Matter of Olsson v. Bd. of Higher Educ of City of N.Y., 49 N.Y.2d 408, 413 (1980). Courts do not intervene to require institutions "to confer diplomas on those who have been deemed to be unqualified." Olsson, 49 N.Y.2d at 413. Our review, in applying New York law, is thus limited to determining whether NYU and Stern have "act[ed] in good faith in its dealings with its students." Id. at 414.

Similarly, with regard to Article 78 claims, "the judgment of professional educators is subject to judicial scrutiny to . . . determine whether they abided by their own rules, and whether they have acted in good faith or their action was arbitrary or irrational." Gertler v. Goodgold, 107 A.D.2d 481, 486 (1st Dep't 1985), aff'd, 66 N.Y.2d 946, 948 (1985).  New York law thus makes clear that, in reviewing universities' decisions regarding academic credentialing, courts must defer to the university's effort to substantially observe the rules, regulations, and procedures it has announced in advance, and will disturb their decisions only if their actions are arbitrary, irrational, or in bad faith.

The University's Bylaws declare, in part, that "it is the duty of each faculty to determine . . . the standards of academic achievement to be attained for each degree offered . . . ."  Bylaws 61(b).  The first inquiry, then, is whether Stern's refusal to certify Rosenthal as a Master of Business Administration after learning about his criminal insider trading could constitute a determination Stern's "standards of academic achievement" under the university's bylaws.  The district court held that it could, and concluded that Rosenthal's "elaborate jurisdictional and procedural arguments" that Stern was without jurisdiction to withhold Rosenthal's MBA after learning of his criminal activity were "entirely without merit."  Rosenthal, 2010 WL 3564975, at *3.

We agree with the district court.  Rosenthal pled guilty to violating federal securities laws.  More particularly, he admitted that he divulged material, non-public information about a confidential acquisition – material he had obtained in his position as a professional accountant – to his brother, and "turned a blind eye" to the likelihood that the brother, an active securities trader, would trade on the information.  Id. at *2 n. 25.  Without question, a business school faculty could reasonably believe that such conduct is not befitting of a member of the academic

4

business community, and that a student who engages in this criminal activity – while working in the very profession in which he now demands that Stern certify him to the world as professionally competent – is not fit to receive the degree.  Consequently, Rosenthal cannot show that NYU or Stern, in reaching this conclusion, acted arbitrarily, irrationally, or in bad faith.  See Harris v. Trustees of Columbia Univ., 98 A.D.2d 58, 71 (1983) (Kassal, J., dissenting) (finding, in a dissenting opinion subsequently adopted by the New York Court of Appeals, 62 N.Y.2d 956 (1984), that "dishonesty and lack of character" are "a matter of vital interest to an academic institution").

Rosenthal does not contest the logic of the foregoing analysis.  Indeed, he concedes that a university could in principle withhold a degree under these circumstances.  Instead, he argues that his contract with NYU and Stern specifically forbids Stern from punishing him for off-campus conduct, however egregious the conduct or connected it may be to his academic pursuits.  This argument fails for two reasons.  First, Stern's own published rules – particularly its Code of Conduct, which specifically admonishes students to "reflect a personal honesty, integrity, and respect for others" in their conduct – provide ample indication, to us and to its students, that Stern did not intend to enter into any such contract with Rosenthal.  Because Stern advises its students that the faculty's disciplinary power includes jurisdiction over, inter alia, "[v]iolations of federal, state and local laws," Stern was within its contractual rights to discipline Rosenthal for his dishonesty demonstrated by his violation of federal law.

Second, even if Stern's authority to discipline Rosenthal is tempered by NYU's commitments as identified in its University-wide rules and policies, nothing in those policies precludes Stern from pursuing the course that Rosenthal now contests.  Rosenthal essentially makes an argument regarding NYU's internal constitutional law.  To do so, he points to a

5

proviso to the aforementioned Bylaw that "subject[s]" the faculty's duty to determine the academic fitness of its degree candidates "to the approval of the Board and to the general University policy as defined by the President and the Senate." Rosenthal then attempts to identify "general University policy" against disciplining students for violations of law outside certain narrowly-defined academic contexts. By this logic, Stern's own rules inconsistent with that University policy are themselves without force.

This argument is unavailing. Rosenthal points to two specific policies, promulgated by the University Senate,[1] to make his argument. Both provisions are, at best, opaque. In one, the rules express the hortatory instruction that "a student . . . convicted of a violation of law, . . . should not be subject to University discipline for the same offense unless his conduct seriously affects his position as a member of the academic community." The use of "should not" as opposed to "shall not" leaves it unclear whether the policy forbids the exercise of power otherwise delegated to the Stern faculty.

In another, a Policy on the Division of Jurisdiction establishes that some kinds of misconduct are within the jurisdiction of either the academic faculty or the University Senate. None of the categories identified in the Policy address criminal conduct identical to that of Rosenthal. A final provision of this Policy addresses conduct that violates "Federal, State, or Local Law." That provision states that "[i]t is the policy of the University to discourage such acts by its members, and such offenses, . . . may be referred to the appropriate outside authority," and concludes that, "[t]o the extent that such acts also fall within one of the categories defined [above], they may also be subject to applicable disciplinary measures within the University."

---

[1] The parties appear to agree that the University Bylaws are superior to both the Senate's policies and those of a particular faculty, and both the faculty's and the Senate's power derives from these Bylaws.

6

Rosenthal contends that, by negative implication, the Policy prohibits university discipline for criminal conduct, like his, not falling within one of those categories.

While these jurisdictional rules are admittedly in some tension with Stern's own strictures on general honesty and assertions of disciplinary jurisdiction over violations of federal law, Rosenthal's attempt to resolve that tension in his favor is unavailing, for two reasons. First, even if Bylaw 61 did preclude action by the Stern faculty inconsistent with Senate policy, the succeeding section, University Bylaw 62, awards Stern's faculty the power to suspend and dismiss its students, and that power is without reservation: the phrase "subject to the approval of the Board and to the general University policy as defined by the President and the Senate," on which Rosenthal relies, is missing from Bylaw 62.[2] Second, even if the policies announced by the University Senate can be construed to limit the business school's decision to withhold a degree from a student who has admitted violating federal securities laws while enrolled in the program, it is far from clear that the Senate itself has the authority to prohibit the Stern faculty from enforcing its policies. Under University Bylaw 34, the Senate's authority with respect to "policies and practices" is limited to "mak[ing] recommendations to the President" and Board of Trustees. Similarly, the Senate is authorized by Bylaw 34(e) to "make *recommendations* for the *consideration* of each of the faculties" with respect to educational policy (emphasis added).[3] It is therefore uncertain whether the Senate even has the authority, under these Bylaws, to limit Stern's decision in this matter.

---

[2] The difference between withholding a degree and dismissing a student is one of semantics: by refusing, by withholding the degree, to allow Rosenthal to complete his MBA, Stern dismissed him from its academic community.

[3] The only express power granted to the Senate is the "power to act upon educational matters and regulations of the academic community *that affect more than one school*." Bylaw 34(c) (emphasis added). In contrast to disruptive activities by students from multiple divisions of the university that affect the university as a whole, Rosenthal's criminal behavior in violation of Stern's code of conduct does not affect other divisions of the university.

As do Rosenthal's brief and the district court's opinion, the foregoing analysis amply demonstrates that NYU's governance provisions are confused and confusing. Fortunately, we need not unwind their internal tangles to resolve this case. To the extent that they are susceptible to conflicting interpretations, the New York courts' emphatic warning that courts must afford "great respect for the faculty's professional judgment" in the case of a "genuinely academic decision," Flomenbaum v. NYU, 890 N.Y.S.2d 493, 498 (1st Dep't 2009), directs us to leave to the university the reconciliation of its own internal governance rules. On this record, it surely cannot be said that, in allowing the business school faculty to enforce its clearly-announced code of conduct against Rosenthal, NYU acted arbitrarily and irrationally. See Gertler, 107 A.D.2d at 486. Nothing in the university rules and procedures cited to us demonstrates that it was arbitrary and capricious for the Stern faculty to conclude that it had the power to apply its Code of Conduct to a violation of federal criminal law to determine it would not certify Rosenthal a "Master of Business Administration" after he pled guilty, while an MBA candidate and professional accountant, to insider trading.

We have considered Rosenthal's remaining arguments and find them without merit.[4] Based on the foregoing, we AFFIRM the judgment of the district court.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk

---

[4] Rosenthal also argues that Stern failed to follow University procedure in its disciplinary proceeding by, inter alia, failing to record the hearing, send him a written report, and notify him of the complaint within 48 hours. Whatever the merit of these arguments, any error was clearly harmless. Stern's decision was based entirely on Rosenthal's own guilty plea. Rosenthal called no witnesses, and makes no argument that stricter adherence to the University's procedural requirements would have produced a result different than the one that the proceeding ultimately produced. "The authorities in New York are plain that where the end result is apparent, and administrative proceedings are moot, they need not be carried to their technical end." Harris, 98 A.D.2d at 66 (Kassal, J. dissenting) (internal quotation omitted). As such, this argument is without merit.